UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | |
|---|---|
| Marcus Hemingway, individually and as the Personal Representative for the Estate of Kenya S. Robinson, Deceased,<br><br>              Plaintiff,<br><br>vs.<br><br>General Motors, LLC, f/k/a General Motors Corporation, a/k/a General Motors.<br><br>              Defendant. | C/A No.: _____<br><br>**Complaint**<br>**(Jury Trial Demanded)** |

The Plaintiff, Marcus Hemingway, individually and as the Personal Representative for the Estate of Kenya S. Robinson, deceased, by and through the undersigned counsel, complaining of the above named defendant herein, respectfully allege and show unto this Honorable Court as follows:

## JURISDICTIONAL ALLEGATIONS

1.   The Plaintiff is the duly appointed Personal Representatives for the Estate of Kenya S. Robinson, as will appear more fully in the records of the Probate Court for the County of Horry, South Carolina in case No. 2017-ES-26-02501.  Pursuant to S.C. Code Ann. §§ 15-5-90 and 15-51-20, the Personal Representative brings this action on behalf of the Estate of Kenya S. Robinson and for those damages recoverable by the heirs and statutory beneficiaries of the Decedent.

2.   At all times relevant to this complaint, the Plaintiff was the husband of Kenya S. Robinson ("Kenya"), and is a citizen and resident of Horry County, South Carolina.

1

3.   Upon information and belief, the Defendant, General Motors, LLC, f/k/a General Motors Corporation, a/k/a General Motors ("GM") is a foreign corporation organized in the state of Delaware, and is a citizen and resident of that state.   Upon further information and belief, the sole member of GM is General Motors Holding LLC, which has its principal place of business in the state of Michigan.   Upon further information and belief, the sole member and owner of General Motors Holding LLC is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan.   As set forth further below, upon information and belief, GM is a successor entity of General Motors Corporation ("GMC").

4.   Subject matter jurisdiction over this action exists in the federal district court pursuant to 28 U.S.C.   § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy herein exceeds seventy-five thousand ($75,000.00) dollars, exclusive of costs.

5.   GM is a registered foreign corporation with the South Carolina Secretary of State, and maintains a registered agent for service of process, namely, CT Corporation System of Columbia, South Carolina.   As described below, the automobile accident which resulted in Kenya's death occurred from her ownership and operation of GM's product in the state of South Carolina, such that GM reasonably should anticipate being subjected to the jurisdiction of the Courts of this state.   Accordingly, this court has *in personam* jurisdiction over GM.   Likewise, venue is proper in the Florence Division of the United States District Court for the District of South Carolina.

## SUCCESSOR ENTITY ALLEGATIONS

6.   With respect to all allegations regarding GM's liability for its predecessor entity's torts and other causes of action, such allegations are stated upon information and belief.

2

7.   As shown by the supporting allegations set forth below, the Plaintiff submits that GM is the mere continuation or reincarnation of the same business enterprise as GMC, and is therefore liable for the torts and obligations of the predecessor entity in addition to its own misconduct which occurred after the formation of the successor entity:

a)  GMC was founded on September 16, 1908, in the state of Michigan, and was incorporated on October 13, 1916, in the state of Delaware

b)  On June 1, 2009, GMC filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York.  On July 5, 2009, the Bankruptcy Court approved the sale of substantially all of the assets of GMC to a predecessor of GM.  GMC sold all of its assets to GM in a transaction finalized on July 10, 2009.   GMC became Motors Liquidation Company, and remained a legal entity for the sole purpose of liquidating its remaining assets and liabilities.  GMC dissolved on December 15, 2011.

c)  Through the July 10, 2009 sale, all GMC brands, inventory, physical assets, management, personnel, vehicles and general business operations transferred to GM.  GM also acquired GMC's contracts, books, and records, as well as the GMC's goodwill and intellectual property.

d)  GM provided no cash consideration for the purchase of GMC's assets, but assumed more than $7 billion of GMC's debt.  GM also provided GMC with ten (10%) percent of GM's common stock, in addition to warrants to purchase fifteen (15%) percent of GM's common stock.

e)  Before the bankruptcy Sale, GMC's principal executive offices were located at 300 Renaissance Center, Detroit, Michigan.  After the bankruptcy sale, GM's

3

principal executive offices were located at 300 Renaissance Center, Detroit, Michigan.  GMC's decision to file for bankruptcy, all major decisions made in the course of the bankruptcy sale negotiations, and all actions of GMC and GM during GMC's bankruptcy proceedings originated from the company headquarters at 300 Renaissance Center, Detroit, Michigan.

f)   Under the terms of the bankruptcy sale, GM assumed the majority of GMC's dealer franchise agreements.  GM also assumed certain GMC agreements with suppliers, including substantially all of GMC's executory contracts with direct suppliers.

g)   After the bankruptcy Sale, GM continued to use over one hundred eleven (111) GMC facilities in twenty-eight (28) states and eighty-nine (89) cities in the United States, eighteen (18) locations in Canada, and locations in  fifty-six (56) other countries.

h)   After the sale, GM retained ownership and control over nearly all of GMC's manufacturing plants, and closed only fourteen (14) plants.  GM also assumed ownership and responsibility for over 3,600 of GMC's United States dealerships.

i)   GMC began production of the Buick Lucerne in 2005 for the 2006 model year.  After the bankruptcy sale, GM continued to produce GMC's "core" automobile brands, including Buick.  GM continued the manufacture, marketing, sale and warranty of the Buick Lucerne model vehicle until 2011.

j)   Following the bankruptcy sale.  GM continued to honor the vehicle warranties and customer programs of GMC on GMC vehicles, including the 2006 Buick Lucerne.  On June 1, 2009, days before GMC filed for bankruptcy protection,

GMC posted on its Internet website (www.gm.com) a "Customer FAQ on GM's

Chapter 11 Filing," which remained accessible on GM's website after GMC's

bankruptcy.  Among other things, GM promised its customers:

"There will be no interruptions in GM's ability to take care of our customers and honor customer programs, warranties and provide replacement parts. In fact, GM has asked the Court for specific orders authorizing GM to honor customer warranties and programs as it always has. You should have total confidence that:

• Our products are safe and sound;

• We will honor your existing warranty;

• Customer promotions and incentives will continue without=interruption;

• You do not need to do anything differently regarding your warranty."

GM continued:

"Will GM honor customer warranty claims?"

"Yes. GM will succeed and win by taking care of our customers every day. GM will assume the obligations to support the express warranties issued by GM to its customers."

k)  Under the bankruptcy sale Agreement, GM also expressly agreed to comply with

certain statutory requirements:

"From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller."

l)  Under the terms of the sale agreement, GM expressly agreed that it would be

responsible for the administration, management and payment of all Liabilities

arising under (i) express written warranties of GMC which were specifically

identified as warranties and delivered in connection with the sale of new, certified

used or pre-owned vehicles or new or remanufactured motor vehicle parts and

5

equipment (including service parts, accessories, engines and transmissions) manufactured or sold by GMC or GM prior to or after the Closing and (ii) all applicable "Lemon Laws".

m) GM had ongoing obligations under the federal law to monitor both GM and GMC vehicles on the road, to make quarterly reports to NHTSA regarding those vehicles, and to maintain all relevant records for five years. GM explicitly accepted those responsibilities for GMC vehicles in the bankruptcy sale agreement.

8.    GM knowingly and intentionally undertook ongoing duties to the purchasers and lessees of GMC vehicles to ensure the safety, function, and value of these vehicles.  Furthermore, GM expressly and impliedly assumed the obligations of GMC to manufacture non-defective vehicles by warranting to the public that the GM brand would remain in operation as a continuation of the same company.

9.    GM undertook the same manufacturing operations as GMC. GM continued the product lines of GMC.  GM continued the business of General Motors as evidenced by the continuity of management, personnel, physical location, assets, and general business operations of GMC. At all relevant times, GM held itself out to the public as the effective continuation of GMC.

10.    The concealment of material facts begun under GMC was continued, carried on, and furthered by GM and its agents.

11.    The totality of the transaction between GMC and GMC demonstrates a basic continuity of the predecessor entity's business.  The entities intended that the bankruptcy sale would save and continue GMC's brands, trade name and product lines, so as to ensure the continuation or reincarnation of the same business enterprise under GM.

12.   GMC's prior knowledge of the ignition switch defect described below may be imputed to GM, given that (i) GM chose to hire the same GMC personal with that knowledge; (ii) that knowledge is reflected in documents by GMC which transferred to GM as a result of the bankruptcy sale; (iii) that knowledge was relevant to the responsibilities of the transferred GM employees when they acted within the scope of their employment with GMC; and (iv) that knowledge was relevant to the responsibilities of the GM employees acting within the scope of their employment with GM.  Additionally, GM's implied, constructive and/or express knowledge of the ignition switch defect arises from the fact that key personnel with knowledge of the defects were employed by GM when GMC ceased to exist. Moreover, many of these employees held managerial and decision-making authority in GMC, and accepted similar positions with GM.

13.  In light of its prior knowledge of the ignition switch defects, and the other defects in the defective vehicle, as well as its continued misconduct following the bankruptcy sale, GM breached its legal obligations to Kenya as set forth below.

## FACTUAL ALLEGATIONS

14.  On the evening of April 4, 2016, Kenya Swas driving her 2006 Buick Lucerne, VIN 1G4HP57266U206066, in an eastbound direction on South Carolina Secondary Road No. 348 in Horry County, South Carolina.[1]   At approximately the same time, Tammy Lynne Hardee ("Hardee") was driving her sports utility vehicle in the westbound lane.

15.  As Kenya approached Hardee's position on the highway, Kenya's Buick involuntarily moved into the oncoming lane of traffic, and collided head-on with Hardee's vehicle.  The force of impact forced both vehicles off the road.  By the time Kenya's vehicle came to a stop, it was

---

[1] Prior to the submission of this complaint, counsel for the parties entered into a tolling agreement which suspended the operation of the statute of limitations until June 2, 2019.

engulfed in flames.  Kenya could not evacuate the Buick, and she was burnt completely to a cinder.

16.  Upon information and belief, Kenya lost control of her vehicle due to a defect in the manufacture and/or design of the ignition switch for the 2006 Buick Lucerne.  Upon further information and belief, at the time of the accident, this defect caused the ignition switch to turn spontaneously into either the "off" or "accessory" position during normal operation, which then caused the complete loss of power to the vehicle's power assisted steering and/or power assisted brakes.  The risk of the defective condition was exacerbated if a key ring attached to the ignition key added weight.  Upon information and belief, this loss of power was the proximate cause of the collision which resulted in Kenya's horrific death.

17.  Upon information and belief, GM was aware of the design and/or manufacturing defect in the 2006 Buick Lucerne's ignition switch well before Kenya's collision and death, but failed to notify the National Highway Traffic and Safety Administration in a timely manner as required by law.  Additionally, GM failed to notify its purchasers and the general public of the danger posed by the defects in the ignition switch assembly in a timely manner.  GM initiated a belated recall of the vehicle in 2014 which notified consumers of the danger posed by the defective ignition switch and the necessity for repairs.  However, the recall notice was not delivered to Kenya before her horrific death.

### FOR A FIRST CAUSE OF ACTION
**(Negligence/Gross Negligence Resulting in Wrongful Death)**

18.  Each and every allegation set forth above is fully incorporated herein.

19.  GM, as successor to GMC and in its own capacity, was negligent, grossly negligent, negligent *per se*, careless, willful, wanton and reckless in its design, production, manufacture, distribution, marketing, sale and maintenance of Kenya's vehicle in the following particulars:

a) In testing, manufacturing, marketing, distributing and/or selling a vehicle which GM knew or had reason to know was dangerous or likely to be dangerous for the use for which it was supplied;

b) In failing to exercise reasonable care to inform customers of the dangerous condition or of the facts under which the vehicle was likely to be dangerous as required by common and statutory law.

c) In failing to warn and instruct the intended and foreseeable users of its vehicles of the defective condition of the vehicles and the high degree of risk attendant to using the vehicles in its ordinary use.

d) In failing to take reasonable action to notify owners and users of the need for maintenance and repairs to the defective condition of the vehicle in a timely manner, and to furnish the means for those repairs to be effected upon notification and recall.

e) In testing, manufacturing, marketing, distributing, selling and/or maintaining a vehicle in violation of applicable statutory law including, but not limited to, federal law as codified at 49 U.S.C. § 30101 *et seq.*

f) In such additional particulars of negligence, gross negligence, negligence *per se*, recklessness, carelessness and willful and wanton conduct which may be shown by the evidence developed through discovery and adduced at a trial of this matter.

All of which were the direct and proximate cause of the death of Kenya in the April 6, 2016 automobile accident.

20. As a direct and proximate result of GM's negligence, gross negligence, negligence *per se*, recklessness, carelessness and willful and wanton conduct, Kenya's statutory beneficiaries and

heirs, as represented by the Personal Representative, have suffered economic loss including, but not limited to. lost earning capacity, severe emotional distress, anxiety, grief, and sorrow, for which Kenya's estate is entitled to recover on behalf of the statutory beneficiaries actual and punitive damages (when allowable under law) pursuant to S.C. Code §§ 15-51-10 *et seq*., in an amount to be determined by the jury.

**FOR A SECOND CAUSE OF ACTION**
**(Breach of Implied Warranty of Merchantability Resulting in Wrongful Death)**

21. Each and every allegation set forth above is fully incorporated herein.

22. By operation of S.C. Code Ann. § 36-2-314, an implied warranty of merchantability arose incident to Kenya's purchase of her 2006 Buick Lucerne, which guaranteed the vehicle would reasonably fit the ordinary purposes for which it was sold.

23. Kenya relied upon, and was entitled to rely upon this implied warranty of merchantability when she purchased her vehicle.

24. The vehicle sold, distributed and/or marketed by GM in its past and present incarnation was not of merchantable quality, but rather was unfit and unsafe for the ordinary usage by Kenya.

25. The condition of the 2006 Buick Lucerne constituted a breach of the implied warranty of merchantability, which breach was a proximate cause of the death of Kenya on the date of her accident.

26. As a direct and proximate result of the breach of warranty, Kenya's statutory beneficiaries and heirs, as represented by the Personal Representative, have suffered economic loss including but not limited to lost earning capacity, severe emotional distress, anxiety, grief, and sorrow, for which Kenya's estate is entitled to recover on behalf of the statutory

beneficiaries actual and punitive damages (when allowable under law) pursuant to S.C. Code §§ 15-51-10 *et seq*., in an amount to be determined by the jury.

## FOR A THIRD CAUSE OF ACTION
### (Wrongful Death/Strict Products Liability)

27. Each and every allegation set forth above is fully incorporated herein.

28. At all times relevant to these allegations, GM marketed, distributed and/or sold its motor vehicles, including the 2006 Buick Lucerne, to members of the general public in South Carolina such as Kenya, with the intention and expectation that the product would be sold to and reach consumers in the condition in which it was sold.

29. Upon information and belief, the condition of the Buick, including the ignition switch, was unchanged from the time it left the manufacturer's control and reached Kenya.

30. S.C. Code § 15-73-10 imposes strict liability upon the marketer, distributer and/or seller for products which are sold in a defective condition unreasonably dangerous to the consumer

31. GM's product was in a defective condition unreasonably dangerous to the consumer, in that it could malfunction as described above while driving under normal operating conditions, thereby presenting a significant risk of bodily injury and death, thereby rendering GM strictly liable in tort.

32. As a result of Kenya's usage of GM's defective product, she suffered great bodily injury and death as alleged above.

33. As a direct and proximate result of GM's marketing, distribution and/or sale of a product in a defective condition which was unreasonably dangerous to the consumer, Kenya's statutory beneficiaries and heirs, as represented by the Personal Representative, have suffered economic loss including but not limited to lost earning capacity, severe emotional distress, anxiety, grief, and sorrow, for which Kenya's estate is entitled to recover on behalf of the statutory

beneficiaries actual and punitive damages (when allowable under law) pursuant to S.C. Code §§ 15-51-10 *et seq*., in an amount to be determined by the jury.

## FOR A FOURTH CAUSE OF ACTION
### (Survivorship Action)

34. Each and every allegation set forth above is fully incorporated herein.

35. GM committed various acts and omissions as previously outlined above, which constitute negligence, gross-negligence, negligence *per se*, carelessness, recklessness, willfulness and wantonness.

36. As a direct and proximate result of the acts and/or omissions of GM as listed above, Kenya sustained severe injuries which led to her death.

37. The Personal Representative is informed and believe that, pursuant to S.C. Code § 15-5-90, the Estate is entitled to a judgment against GM for the damages which Kenya would be entitled to had she survived, both actual and punitive, for the intense pain and suffering she consciously experienced before her death.

## FOR A FIFTH CAUSE OF ACTION
### (Loss of Consortium)

38. Each and every allegation set forth above is fully incorporated herein.

39. As alleged more fully above, GM proximately caused Brittany's death by its tortious conduct.  Such improper conduct was the proximate cause of the loss of the society, fellowship, comfort, companionship, aid, services, and conjugal relations between the Plaintiff and Kenya which can never be restored.

40. That by reason and in consequence of the aforesaid conduct, the Plaintiff has suffered and will continue to suffer great pain, humiliation and mental anguish and loss of enjoyment of his marital life, for which GM is liable to him in an individual capacity.

41.  The Plaintiff is informed and believes that he is entitled to judgment against GM in an individual capacity for his actual, consequential, and punitive damages for his loss of consortium in an appropriate amount determined by the jury.

WHEREFORE, the Plaintiffs in this action pray for judgment against the Defendant:

(1) for actual and punitive damages in an amount to be determined by a jury,

(2) for the costs of this action, including reasonable attorney fees as allowed by law, and

(3) for such other relief as the Court may deem just and proper.

Respectfully Submitted,

*s/ Bradford W. Cranshaw*
Bradford W. Cranshaw
(Federal Bar No. 9733)
GRIER, COX & CRANSHAW
Post Office Box 2823
Columbia, South Carolina 29202
Tele:  (803) 731-0030
Fax:  (803) 731-4059
bcranshaw@griercoxandcranshaw.com
**ATTORNEY FOR THE PLAINTIFF**

*s/ William F. O'Neil, III*
William F. O'Neil, III
(Federal Bar No. 5938)
P.O. Drawer 3909
Myrtle Beach, South Carolina 29578-3909
Tele:   (843) 444-4357
Fax:    (843) 448-9005
oneillaw@aol.com
**ATTORNEY FOR THE PLAINTIFF**

May 31, 2019